# THE PEOPLE OF THE STATE OF NEW YORK, RESPONDENT, *v.* EUCEBIA FITZGERALD, APPELLANT.

*A coroner cannot exhume and dissect a dead body, except upon complying with all the requirements of the statute — Code of Criminal Procedure, secs. 777, etc. — he must summon a jury — what evidence justifies a conviction of body stealing under section 311 of the Penal Code.*

Upon the trial of the defendant by a Court of Oyer and Terminer, upon an indictment charging her with the crime of body stealing, evidence was given tending to show that in the latter part of March, 1885, the defendant, in company with a detective employed by her. having in their possession two written instruments purporting to be affidavits made by persons residing in San Francisco, exceedingly informal in character and uncertified by any officer so as to make them admissible as evidence in this case, applied to a coroner in the county of Chemung, and requested the exhumation of the body of General Irvine for the purpose of dissection and examination. Irvine died in San

Francisco in November, 1882, his remains being subsequently removed to Elmira, and there interred, in 1882.

The defendant, who claimed to be a foster sister of the deceased, claimed that Irvine was murdered by his wife and daughter; and in attempting, unsuccesfully, to enforce claims made by her against the estate of Irvine, threats and suggestions of criminal agency, on the part of the family of the deceased, in producing his death were made by her.

Pursuant to this application the coroner, without notifying the wife or daughter, or any of the friends of Irvine, and without summoning or impanneling any jury, directed the superintendent of the cemetery to exhume the body of Irvine. In accordance with this direction the body was disinterred and an autopsy was made by physicians, the stomach, gall and a portion of the duodenum being removed and the body again interred.

*Held,* that as the coroner failed to summon a jury, as required by sections 773 and 774 of the Code of Criminal Procedure, he lost all jurisdiction, and his act was not the act of an officer but of an individual; that he was a trespasser and a wrong-doer, and that his official character could not be invoked to protect others acting under his directions.

That, as the evidence justified the jury in finding that he acted at the instigation of the defendant, and that the defendant was actuated by malicious motives, the jury were justified in finding the defendant guilty of body stealing, as that offense is defined in section 511 of the Penal Code. (HARDIN, P. J., dissenting.)

The question as to the jurisdiction of a coroner of Chemung county to direct the exhumation of a dead body interred in that county, where the death occurred in the State of California, was not decided in this case, although, as the conviction could be affirmed on other grounds, it was assumed to exist.

APPEAL from a judgment of conviction rendered against the appellant in the Court of Oyer and Terminer of Chemung county on the 3d day of December, 1885, upon the verdict of a jury declaring her guilty of the crime of body stealing.

The indictment accused "Eucebia Fitzgerald, Edmund A. Reilly and J. Thomas Nealson of the crime of body stealing, committed as follows: That said Eucebia Fitzgerald, Edmund A. Reilly and J. Thomas Nealson, on the 9th day of April, 1885, at the city of Elmira, in the county of Chemung, with force and arms, unlawfully and feloniously did remove the dead body of a human being, to wit, that of William Irvine, from a grave or place where the same had been buried, without authority of law, for the purpose of dissection, for procuring the reward for the return of the same, and for motives of malice and wantonness, against the form of the statute in such case made and provided." A separate trial was had of the appellant at the December Oyer and Terminer, and the jury

found her guilty of the crime charged in the indictment. Thereupon the court sentenced her to be confined in the Monroe County Penitentiary for the term of two years.

In the latter part of March, 1885, Eucebia Fitzgerald, in company with one J. Thomas Nealson, having in their possession certain alleged affidavits of an undertaker and physicians residing in the city of San Francisco, applied to E. A. Reilly, a coroner of the county of Chemung, and requested the exhumation of the body of General William Irvine, for the purpose of dissection and examination. Irvine had died in the city of San Francisco, November 12, 1882, from the assigned cause of pulmonary appoplexy. His wife and daughter were with him at the time, and his remains were subsequently transferred to the city of Elmira, and there interred in the month of December, 1882.

The defendant Fitzgerald claimed to be a foster-sister of the deceased, and to be interested in such proposed examination in behalf of public justice. She publicly stated that his death had resulted from the administration of poison and by violence at the hands of his wife. Irvine left a large estate at the time of his decease, and within four-and-twenty hours after it had occurred the defendant Fitzgerald called upon his wife and daughter and stated that she was the owner of real estate of much value which stood in Irvine's name; that she had loaned him $2,400, or thereabouts, the day of his demise, and that he was largely indebted to her for services rendered in the capacity of a nurse during the years immediately preceding, and that unless some amicable settlement was made with her, by which her rights were protected, she would make the air blue with scandal, and stated in a written note to Irvine's wife certain family secrets affecting her chastity, in the possession of which she claimed to be.

Coroner Reilly, without consultation with the criminal authorities of the county, and without notifying the wife and daughter or any of the friends or relatives of the Irvine family, directed the superintendent of Woodlawn Cemetery, situated in the city of Elmira, to exhume the body of the said Irvine. Acting in accordance with such direction, the body of Irvine was disinterred April 8, 1885, during the night-time and in the early morning of the ninth. Coroner Reilly, with the man Nealson, and two or three physi-

cians, made an autopsy of the body of the said Irvine, and dissected various portions of it; and an examination of the coffin was made to the extent of cutting open the pillows enclosed in it, and the cloth side enclosing the corpse, and practically destroying it, in a search — as the defendant and her detective stated — for a will, which it was supposed to contain. The body, as the physicians stated, already showed that one autopsy had been held upon it in the city of San Francisco. Coroner Reilly took the stomach, the gall, liver, spleen and a portion of the duodenum and carried them away with him. The body was then replaced in its coffin and restored to the grave from which it had been taken. No jury was summoned by the coroner, and none ever appeared or were sworn. After such examination of the body, and until the present day, no jury has ever been drawn, summoned or sworn in the case. The subsequent discovery of these facts led to the arrest, indictment and conviction of this defendant. On the trial, and prior thereto, it appeared that a chemical examination of the portions of the body of Irvine, which had been removed by Coroner Reilly at the instance of the defendant, revealed the fact that there was no poison contained in them.

*Jacob Schwartz*, for the appellant.

*John B. Stanchfield*, for the respondent.

BOARDMAN, J.:

The coroner has no jurisdiction to act except in the manner provided by law. (Code Crim. Pro., § 773.) He had no right, on his own motion, or at the request of the defendant, to take up a dead body and have portions removed for analysis. No one can suppose that a coroner is possessed of such an irresponsible authority to be exercised upon suspicion upon the buried bodies in our cemeteries. He can proceed only by the aid of a jury. The statute was not complied with in this case. No jury was summoned. The act done was without authority of law. In failing to comply with the law he lost all jurisdiction, and the act was not the act of an officer but of an individual. He was a trespasser—a wrong-doer, and his official character could not be invoked to protect others. He acted at the instigation of the defendant alone. No one else had

any motive to act or desired action. And who was the defendant, and what was her motive? Was it in the interest of a just administration of the criminal law? She knew, in California directly after the death of Gen. Irvine in 1882, from Dr. Wooster, exactly what she makes use of in 1885 in New York to accomplish her purpose here, as appears by the evidence of her son, Horace N. Wooley. She claimed to be a relative by adoption to Gen. Irvine from his youth. By reason thereof, and for other reasons, she claims an interest in his affairs and the ownership of his property. Both claims are successfully controverted. She sends a hired detective or servant to shadow the family and get some evidence in her interest. In the midst of the California litigation over the title and ownership of Irvine's property there, she leaves San Francisco and follows her detective to Elmira, where she attempts to get a favorable adjustment of her claims against the property of the deceased. Threats are made use of. Suggestions of criminal agency on the part of the family of the deceased producing his death are made. All these means failing, more active measures are instituted and she proposes and urges the disinterment of the body and the examination of some of the organs for poison. To carry out this purpose she has procured for use two written instruments, affidavits, or bogus affidavits, exceedingly informal, uncertified by any officer to make them evidence in this State, and produces them to the coroner to induce action. This is the only evidence, known to her in 1882, as well as it was in 1885, on which is founded the suggestion that Irvine was murdered by his wife and daughter. It is used to incite action by the coroner, and he undertakes to act. The defendants' motive is further illustrated by her search for a will in the coffin. She requests the coroner and Nealson to search for a will of deceased in the coffin, and they do so, cutting open the pillow for that search. She came to Elmira to have the body taken up and the stomach examined, and she proposed to stay until that was done. She was the guiding, animating spirit for her own malicious and selfish motives in securing this disinterment. Mr. Reilly (the coroner) ceased to be coroner, and as her agent, and at her request, searches the coffin for a will. Was there anything in the relations of the defendant and Gen. Irvine, as shown by the evidence, which could justify her

action? Was there any evidence that the deceased, came to his death by criminal agency? The jury has answered both questions in the negative. It has also found that the defendant was actuated by malicious motives, that she was attempting to extort money or property from the family. of the deceased, and that failing in persuasions or threats, she resorted to more violent proceedings to bring the family to terms or to blacken their reputation with suspicions of criminal agency in the death of the husband and father. The jury has found that what was done was so done at her request, by her instigation, for her purposes and with malice.

Of course it is not intended to say that the jury made such express findings. What we do say is, that the evidence would justify such findings, which, being found, would sustain this conviction. (Penal Code, § 29.) This section, with section 511 of the Penal Code, are all that are necessary in a proper case to connect the defendant with the act done by others, and make her responsible therefor as if done by herself.

Let us review the exceptions taken upon the trial, and see whether error was there committed. The district attorney was allowed to prove that Gen. Irvine came to his death from natural causes. This evidence tended to show that the conduct of the defendant in charging a violent death was false, without any reasonable foundation and instigated by malice. The motives of defendant were properly in issue. The ruling limiting the answer of the witness, Nealson, upon his cross-examination was proper. The defendant, on cross-examination, had no right to the conversation further than was limited by the court, viz.: "Such portions of the conversation as relate to matters called out by Mr. Staunchfield." The rulings as to the admission of the testimony of the physician who conducted the autopsy as to what was said to him by Reilly, etc., are explained upon the denial of the motion to direct an acquittal of the defendant, and as so explained the exceptions are not valid. It is possible, however, that whatever was said or done on that occasion was a part of the *res gestæ* showing, among other things, that no coroner's jury was called, and that Reilly had not contemplated calling one. Besides, if Reilly was acting for, and at the request of the defendant, his declarations in connection with his acts, and tending to

characterize them, were proper. We see no valid exception to the evidence allowed to be read from the first commission.

The declarations of the defendant to Mrs. Merkle, in 1882, in Elmira, as to her relations with Gen. Irvine, were properly admitted in evidence and were the proper subject for contradiction. For the same purposes witnesses were properly called to show that Irvine never lived in Kentucky, and could not have been adopted by defendant's father, as and when she claimed, thus overthrowing the pretended youthful intimacy between defendant and deceased, upon which the defendant based their later friendship.

We do not see any error in the cross-examination of Charles A. Collins. The latitude allowed on cross-examination is reasonably broad. The defendant had proved the advice which Collins had given to her, and this cross-examination related to what was said in connection with the advice given, and tended greatly to qualify, if not destroy it, so far as it was to be used as a justification for her action.

Numerous other objections and exceptions are cited upon appellant's points without any comment or anthority, showing the rulings of the court to have been erroneous. The reading of the case and of such objections, as they occurred during the progress of the trial, does not show any errors. In fact the case appears to have been tried in a painstaking and careful way, and we are convinced that the rights of the defendant were carefully guarded by the learned judge.

Inasmuch as this conviction can be sustained upon other grounds, it has not been deemed necessary to consider the question of the jurisdiction of a coroner of Chemung county after interment of a dead body in such county where the death occurred in the State of California. This opinion assumes that the coroner, so long as he follows the statute, has such jurisdiction, but without so deciding.

We think the judgment should be affirmed.

FOLLETT, J., concurred.

HARDIN, P. J. (dissenting):

General Irvine died in the city of San Francisco, on the night of November 12, 1882, suddenly, having during the day been out gunning, returning to his home in the evening, after partaking of a

light repast, consisting of tea, eggs, cold meat and bread and butter, prepared by his wife Phœbe, who, with their daughter, Mrs. Merkle, were occupying apartments together. Soon after partaking of the refreshments, he became distressed and made complaints of internal pains. The daughter left for a physician, and upon returning they found that death had taken place. The remains were taken that night to the rooms of an undertaker, and they were subsequently embalmed, and on the 4th of December were conveyed by the widow and daughter to the city of Elmira, where they were interred in Woodlawn cemetery.

About a year after the death, inquiry was instituted as to the cause thereof, and the defendant employed a detective named Nealson, who visited the city of Elmira and returned to San Francisco and made a report to the defendant, who then applied to the undertaker who embalmed the body, and to Dr. Wooster, the deceased's intimate friend and physician, who had viewed the body, and they gave affidavits of certain facts within their knowledge.

In the affidavit of Dr. Wooster, subscribed March 11, 1885, in connection with the statement of facts, he adds: "In my opinion, he was first poisoned in his food or drink, and then, when in agony from the effects of the dose, he was struck on the head to stop his contortions and groans."

Porter, the undertaker, stated in the affidavit subscribed by him, the condition of the remains when he received them, and that sundry persons viewed the remains, "among others Dr. Wooster, who remarked that to him it looked as having been poisoned."

With these papers in her possession, the defendant visited the city of Elmira, where she met the detective Nealson. She sought legal counsel as to the method to be pursued in order to investigate whether General Irvine died a natural or unnatural death. She consulted an attorney, who advised her that the coroner of the county of Chemung had jurisdiction to hold an inquest over the remains, and that the "papers, upon their face, authorized him, the coroner, or were sufficient upon which he might exercise his discretion in the matter."

The defendant and Nealson visited the office of Dr. Reilly, the coroner of the county of Chemung, and held a conversation in regard to the circumstances attending the death of the deceased.

The affidavits of Porter and Dr. Wooster were presented to the coroner, and the defendant asked Dr. Reilly "to do his duty as a coroner — to examine and see if the proofs were sufficient to authorize him in proceeding," and " that she wished the body to be taken up and the stomach, or some part of it, to be analyzed, to see if there was any trace of poison there." She made the request that the evidence should be produced if it was there.

After that interview, Coroner Reilly determined to proceed in the premises. He visited Nathan Baker, superintendent of Woodlawn cemetery, at his house, and said to him, viz. " That he had evidence to satisfy him that a wrong had been perpetrated, or sufficient to warrant him in making an examination of the body of General Irvine; that he had sufficient grounds of acting, and he asked Baker, the superintendent, to act," showing him one of the affidavits and stating that he had others. Thereupon the superintendent determined to act in the premises and facilitate the proceedings in behalf of the coroner. Thereupon directions were given Abbott, the sexton, to open the grave and remove the remains to the vault in the cemetery, for the purpose of an examination.

Reilly, the coroner, also applied to Dr. Wey to become one of two physicians to make the examination, and on the evening of the 8th of April, Reilly visited the office of Wey, with Nealson, avowing that he had full authority in the premises " to conduct an examinaton and have an examination made by the physicians." The hour was fixed for an examination at ten the next morning, and Reilly informed Wey that he would "notify Dr. Squires, and we might expect to meet at the receiving vault in Wooodlawn cemetery " at ten the next morning. Accordingly they met the next morning at the receiving vault in Woodlawn cemetery, where the physicians found Coroner Reilly and Nealson and Baker and Abbott. The body was found lying in a coffin or casket on the floor of the receiving vault. The coroner made a minute of the nature of the covering of the coffin and its handles and the plates, and the descriptions of every other matter connected therewith. Drs. Wey and Squires raised the head and shoulders of the body, and after carefully scrutinizing the face, and the coroner making a minute thereof, a careful examination was made of the head, and the stomach and duodenum and certain other parts ot the body

were removed and delivered to Dr. Reilly, who placed them in a vessel he had prepared for that purpose. After the examination, the coroner went over to the house of Abbott, the sexton, in the cemetery grounds, where Baker suggested the propriety of having a coroner's jury, and Wey replied, " It is too late for such a proceeding."

Baker testified that he was present at the request of the coroner, to identify the remains, and that he did so identify them, and that he was sworn upon that point by the coroner; that while at the vault he had a conversation with Dr. Reilly, the coroner, and he adds, viz : " Dr. Reilly and myself conversed for a few minutes about having a jury, and I said to Dr. Reilly there was enough within the bounds of the cemetery to make up a jury, and he asked if I would have them all come to the house, and I so ordered and they came. I think there were five men that came off the cemetery ; I think there were nine men there then. When I had sent for the men, I went back to the house and did not go into the vault again. About that time Dr. Wey came over to the house."

He also testifies that he held a conversation with Dr. Wey and stated as follows, viz. : " Dr. Reilly has seemed to think it advisable to have a jury. There are men enough here to have a jury without delaying, and there are men enough. They are already here, and Dr. Wey said it was of no use ; that if there was anything found to show that this man died from any causes other than natural causes, the whole procedure would have to go to California, and this jury would never be heard of again. I stepped out of doors and Reilly was coming over from the vault and he had not yet come in the house, and I said Dr. Wey thinks it is entirely useless to have a jury, and I don't wish to urge this matter one way or the other, doctor, and Dr. Wey came out and he repeated to Dr. Reilly what he had said to me in the house, that it was no use to have a jury, and he gave his reasons as I have stated."

No jury was, in fact, sworn to hold an inquest. The remains were recoffined and returned to the grave, except the part removed therefrom as already stated.

Powers and duties of a coroner are conferred by statute. Section 773 of the Code of Criminal Procedure provides, viz. : " When a coroner is informed that a person has been killed or dangerously

wounded by another, or has suddenly died under such circumstances as to afford a reasonable ground to suspect that his death has been occasioned by the act of another, by criminal means, or has committed suicide, he must go to the place where the person is, and forthwith summon not less than nine or more than fifteen persons, qualified by law to serve as jurors, to appear before him forthwith, at a specified place to inquire into the cause of the death or wound."

Section 774 provides that " when six or more of the jurors appear, they must be sworn by the coroner to inquire who the person was, and when, where and by what means he came to his death, or was wounded, as the case may be, and into the circumstances attending the death or wounding, and to render a true verdict thereon, according to the evidence offered to them or arising from the inspection of the body."

Section 775 authorizes a coroner to issue subpœnas for witnesses returnable forthwith, or at such time and place as he may appoint. He must summon and examine as witnesses every person who, in his opinion, or that of the jury, has any knowledge of the facts. It also prescribes " he must summon as a witness a surgeon or physician, who must, in the presence of the jury, inspect the body and give a professional opinion as to the cause of the death or wounding."

These sections of the law are substantially a re-enactment of the provisions of the Revised Statutes in respect to coroners' inquests. (2 R. S., 743.) We are of the opinion that the affidavits and information lodged with the coroner were sufficient to justify his exercise of his discretion to proceed in the premises.

The expression in section 773 of the Code of Criminal Procedure, to wit: " When a coroner is informed that a person has been killed or dangerously wounded," etc., seems to warrant the conclusion that affidavits, or information even not sworn to, may be acted upon by a coroner in determining whether it is his duty to proceed in a given case. When such information produces in the mind of the coroner " a reasonable ground to suspect that a death has been occasioned by the act of another by criminal means " he must go to the place where the person is.

We find no exception or exclusive words in the statute which restrict or limit the duty of a coroner in case such information shall be given to him so as to exclude the examination of the body found

within his jurisdiction, although the death may have been occasioned or produced in another jurisdiction. The coroner is " a very ancient office at the common law." (1 Black. Com., 347.)

The lord chief justice of the King's Bench is the principal coroner in the kingdom, and may, if he please, exercise the jurisdiction of a coroner in any part of the realm. The office is of equal antiquity with the sheriff. There the coroner was chosen for life, and his office and power were, like those of the sheriff, either judicial or ministerial. (1 Black., 348.) The coroner's court was one of record. (4 Black., 247.) His proceedings being in a court of record might be reviewed by *certiorari.* While certain of the powers and duties which devolve upon a coroner and his court in England have been devolved upon a coroner by statute in this country, it has uniformally been held that a coroner does not hold a court of record and that he has only such powers as are conferred upon him by the statute. (*People* v. *Budge,* 4 Park. Crim. R., 522 ; Crocker on Sheriffs, 907.)

In England the finding of a coroner's jury is equivalent to a bill of indictment. Not so in this country. (*People* v. *Budge, supra.*)

In *Regina* v. *Ellis* (2 C. & K., 470) it was held that in a case of manslaughter where the cause of the death and the death occurred in a county, and the body after death was removed to a city, and the coroner of the city held the inquest, and he was tried for the manslaughter on the inquisition, that the inquest was properly held, under 6 and 7 Victoria (chap. 12).

We think it was properly held, at the trial, that the coroner of Chemung had jurisdiction to proceed, under the statute, to inquire into the cause of the death. For that purpose he was authorized to employ a surgeon or physician to make a *post mortem* examination. (Code of Crim. Pro., § 775.)

Necessarily, in the discharge of the duties of a coroner, he must exercise some discretion as to the order of events. In the case in hand, before a surgeon or physician could examine the body, it was necessary that it should be removed from the grave, and proper that it should be placed, as it was, in the vault, a suitable place for making the examination by the surgeons or physicians, and, also, for the purpose of being viewed by a jury.

It seems that in England, where the duty of the coroner is judi-

cial, he can only take an inquest *super visum corporis*, and that an inquest not thus taken is void. *King* v. *Ferrand*, 3 Barn. & Ald., 261.) In the case last cited it was said: "If a body be interred before he come, he must dig it up." "This he may do lawfully within any convenient time, as within fourteen days." If the coroner had summoned a jury and had them sworn in the presence of the body in the vault, undoubtedly his inquest would have been valid. In the ordinary discharge of his duty such jury should have been sworn, viewed the remains and certified to their inquest.

Though it be conceded that no valid inquest was held, we are to inquire whether the acts of the coroner, and those inducing him to act and aiding him in the performance of his duty, are criminal, because, forsooth, the coroner improperly omitted to complete a valid inquest,

It must be assumed that the coroner had jurisdiction and was, therefore, warranted in causing the body to be removed from the grave for the purpose of enabling him to hold an inquest thereon, and that he had authority to employ a physician to aid in a *post-mortem* examination of the remains.

Section 308 of the Penal Code provides, viz.: "The right to dissect the dead body of a human being exists in the following cases: First. In cases prescribed by special statutes. Second. Whenever a coroner is authorized by law to hold an inquest upon the body, so far as such coroner authorizes dissection for the purposes of the inquest, and no further. Third. Whenever and so far as the husband, wife or next of kin of the deceased, being charged by law with the duty of burial, may authorize dissection for the purpose of ascertaining the cause of death and no further.

It must be assumed that there was no unlawful dissection authorized or carried forward by the coroner (*Rhodes v. Brant*, 21 Hun, 1), and that the coroner had a discretion "to determine whether any persons, and what persons, may be present besides the surgeons." (*Crisfield* v. *Perine*, 15 Hun, 202; S. C. affirmed, 81 N. Y., 622.) In that case it was said: "Not even the jurors have a right to witness the examination. They are to be informed of what it discloses by the testimony of the surgeons." We do not understand that the trial judge indicated that there had been any unlawful

dissection of the body of the deceased. Assuming, pursuant to section 29 of the Penal Code, that the defendant was a principal, or, as the law stood before the adoption of that section, an accessory before the fact, it is claimed that she was guilty of the crime of body stealing, in that she induced or procured the coroner to commit that crime.

Section 311 of the Penal Code provides who shall be liable for that crime in the following language, viz. : "A person who removes the dead body of a human being, or any part thereof, from a grave, vault or other place where the same has been buried, or from a place where the same has been deposited while awaiting burial, *without authority of law*, with intent to sell the same, or for the purpose of dissection, or for the purpose of procuring a reward for the return of the same, or from malice or wantonness, is punishable by imprisonment for not more than five years or by a fine not exceeding one thousand dollars, or both."

In order to constitute the crime under this statute there must be a removal of " the dead body of a human being from a grave, vault or other place where the same has been buried without authority of law." If such removal is made with the authority of law no crime can be predicated of the act, and where the removal takes place without any warrant of law it must also be found, as a fact, that it was made with intent to sell the body or for the purpose of dissection or for the purpose of procuring a reward for the return of the same, or from malice or wantonness.

It is not claimed upon the evidence before us that the body was removed with any intent to sell the same, nor was it held at the trial, nor do we think upon the evidence given at the trial it could justly have been held that it was removed for the purpose of dissection. Nor do we think upon the evidence given upon the trial that a finding that the removal from the grave was for the purpose of procuring a reward for the return of the body was authorized.

But it is claimed that the removal was made from malice or wantonness. The physical, actual removal, was made by Abbott, the sexton. Surely the evidence does not warrant a finding that he was actuated by malice or wantonness, nor does the evidence indicate or warrant the conclusion that Baker, the superintendent of the cemetery, in giving directions to open the grave and make a trans-

fer of the remains to the vault preparatory to an examination by a physician and an inspection by a jury, was actuated by malice or wantonness. Apparently he believed it was his duty to yield to the requests made by Reilly, the coroner, in that regard. Nor is there any evidence which satisfies the judgment that Reilly, the coroner, entered upon the discharge of his duty in the premises, collusively, maliciously or wantonly. On the contrary the evidence seemed to warrant the conclusion that he entered upon the discharge of his duty and the exercise of his powers in the premises as a public officer charged with the performance of difficult and delicate duties. Nor do we think the evidence warrants the conclusion that when he commenced the discharge of his duty in the premises he had formed a determination or conclusion not to summons a jury, or not to fully and properly execute his duty in the premises. It seems more reasonable to suppose that he entered upon the performance of his duty with reasonable and proper motives. It is but reasonable to presume that he, as a sworn public officer, fully intended to exercise the duties and functions of his office when he requested the superintendent to direct to be removed the remains to the vault for the purpose of being inspected by a surgeon.

The case was exceptional and unusual. A death had occurred in California. And if the death was unnatural or caused by criminal agencies the coroner may have supposed that the finding of the jury in a formal inquest would not be effective in aid of the execution of the criminal laws in the State of California.

There is evidence in the case tending to show that he entertained the idea of having a jury sworn and an inquest formally found immediately after the examination of the body had been had by the physicians at the house of Abbott, the sexton. It is not unreasonable to suppose that he was dissuaded from completing the inquest by the discussion had in respect thereto at the time.

While it is not important to determine on this occasion at precisely what period of time the coroner abandoned the idea of impanneling a jury, it is important to give some consideration thereto in determining the questions which were made in respect to the defendant's knowledge thereof. We have found nothing, however, in the evidence which leads us to the conclusion that there was any preconceived design on the part of the coroner to omit to summon a

jury. We are inclined to the opinion that he suddenly fell into an error, in regard to his duty, at the house of the sexton, perhaps in the innocent supposition that the ends of justice would not be subserved by further continuance of the proceedings incident to an inquest. If the coroner, when he entertained the application of the defendant and received the affidavits and information in respect to the circumstances of the death of Irvine, came to the conclusion that it was his duty to act in the premises, and entered upon the discharge of the duty in the manner detailed by the evidence without collusion, or malice or wantonness, fully intending to do his duty in the premises, and took the several steps in performance thereof down to the period of time when it was possible for him to have impanneled a jury in the presence of the remains, after the examination by the physicians, and then and there came to the conclusion, improperly, that the further continuation of the proceedings of the inquest would be useless, though he was mistaken in such conclusion, we are of the opinion that he had not violated the statute against body stealing. But it is claimed the defendant is guilty of a violation of that statute, "if she knew that the coroner was not to hold an inquest, or do what he did, with a coroner's jury." Indeed, such, in effect, is the tenor of the charge delivered to the jury.

The counsel for the defendant requested the court to charge, as a proposition of law, viz. : " That the fact that no coroner's jury was called or sworn does not constitute the crime of body stealing." To that request the court replied, " That is technically correct. The fact that no coroner's jury was called does not steal the body." Thereupon the defendant's counsel requested of the court to charge as follows : " If the jury believe that the defendant requested the coroner simply to do his duty she is not responsible for any violation of law." To that the court replied : " If she knew that the coroner was not to hold an inquest, or to do what he did without a coroner's jury, she is responsible; and if she was attempting to use legal forms as a cover to accomplish the ulterior purpose of getting possession of the stomach of General Irvine to coerce a settlement of her claims, and with malice and wantonness, she is responsible." The defendant's counsel then asked the court if there was a refusal to charge the request and the court replied : " Yes, sir; further or

other than I have already charged." An exception was taken by the defendant and a further request made, viz. : " I ask your honor to say to this jury that there is no evidence in this case that this defendant knew, or had cause to know, that coroner Reilly would not call a jury." To that request the court replied, viz. : " There is no evidence, of which I am aware, further than or other than the fact that she had instruction from Mr. Collin of the necessity of a coroner's jury, and there is no evidence that she asked to have a coroner's jury, and that Mr. Nealson, her detective, who was here under her employ, as I understand, for a *per diem* compensation, was present at the time without the suggesting of a coroner's jury, and that there was no suggestion from any quarter, except from Mr. Baker, that a coroner's jury was necessary ; and under all the circumstances of the crse I think it is for the jury to say whether there was a purpose on the part of coroner Reilly to call a jury, and whether she knew it." To that refusal there was an exception, and also to the qualification. Thereupon the defendant's counsel asked the court to charge that if it was not necessary for this defendant, when she requested coroner Reilly to make an examination, to ask him also that he should call a jury. To that request the court replied : " That would be so if there was no knowledge on her part that he did not intend to call a jury." The counsel for the defendant excepted.

The witness, Baker, testified while at the vault he held a conversation with Dr. Reilly " about having a jury, and I said to Dr. Reilly there was enough within the bounds of the cemetery to make up a jury, and he asked if I would have them all come to the house, and I so ordered and they came ; I think there were five men that came off the cemetery ; I think there were nine men there then ; when I had sent for the men I went back to the house and did not go in the vault again, and the men came, and about that time Dr. Wey came over to the house, and Dr. Wey said it was of no use, that if there was anything found to say that this man died from any causes other than natural causes the whole procedure would have to go to California and this jury would never be heard of again."

Dr. Wey is called later in the trial and testified that he did not say to Reilly on that occasion " that the calling of a jury was all flummery ; * * * that the drawing of a coroner's jury was a

piece of flummery, or all flummery." In other respects, however, he does not contradict the testimony given by Baker, tending to show that up to that time the coroner entertained an intention and commenced the execution of that intention by summoning jurors, and that he then and there fell into the error of omitting further to consummate the proceedings by a completed inquest.

We think the court fell into an error in refusing to yield to the requests which we have already quoted, and that the defendant was entitled to have the jury instructed in accordance with the tenor of said requests. We are not able to say that the jury would have reached the same conclusion had they been told that it was not necessary for her, " when she requested Coroner Reilly to make an examination," *to ask him, also, that he should call a jury.* It does appear by the evidence that in an interview she held with the coroner at the time the affidavits were presented and the information communicated which led him to act, that she demanded of him *that he discharge his duty* in the premises. As we have already seen, a part of that duty was the impanneling of a jury and returning and filing a formal inquest.

The foregoing views lead to the conclusion that the conviction and judgment should be reversed and a new trial ordered.

Judgment affirmed.